FILED

12 OCT 11 PM 3:27

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _xem_ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE SPENCER,<br><br>                     Petitioner,<br><br>      vs.<br><br>JAVIER CAVAZOS, Acting Warden, et al.,<br><br>                     Respondents. | Civil No.     09-2541 BEN (KSC)<br><br>**REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

## I.    INTRODUCTION

Petitioner Julie Spencer, a state prisoner proceeding pro se and in forma pauperis, has filed a Petition for Writ of Habeas Corpus (Pet.) pursuant to 28 U.S.C. § 2254, challenging her convictions in San Diego County Superior Court case number SCE257643 for second degree murder, robbery, attempted arson, elder abuse, theft from an elder, false imprisonment of a elder, and forgery; the charges also included various weapons allegations. (Lodgment No. 1, vol. 1 at 0174-80; Pet. at 3-7, ECF No. 1; First Amended Pet. (FAP) at 6-8, ECF No. 4; Second Amended Pet. (SAP) at 6-8, ECF No. 7.[1]) For the reasons set forth below, the Court recommends the Petition be **DENIED.**

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28

---

[1] For ease of reference, the Court will use the page numbers assigned by the Court's electronic filing system.

1    U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings

2    of historical fact, including inferences properly drawn from these facts, are entitled to statutory

3    presumption of correctness).  The following statement of facts is taken from the California Court of

4    Appeal's opinion denying Spencer's direct appeal of her convictions:

5            In the fall of 2005 Spencer was hired to be the live-in caregiver for 98-year-old
     Jack Parks, who lived in a mobile home in Santee.  Shortly after she was hired, Spencer
6        forged two checks on Parks's account in an amount in excess of $10,000.  Parks
     apparently became aware of the forgeries and was permitting Spencer to repay the
7        amounts from her salary.

8            On December 19, 2005, Spencer attacked Parks in his mobile home.  She
     punched and kicked him, cut him, bound him with a vacuum cord and attempted to set
9        fire to Parks and his mobile home.  Spencer took both of Parks's hearing aids and all of
     his telephones.

10

11           Because of his injuries and the removal of the phones, Parks was unable to
     summon help.  He was able to crawl into bed and the next morning he was able to crawl
12       to his car and drive the short distance to his neighbor in order to get help.

13           Parks suffered four facial fractures, a broken rib, lacerations on his hand and ear
     and multiple bruises over his body.  He was taken to the hospital where he remained until
14       he stabilized.  Parks was then sent to a nursing home.  After a short time his condition
     deteriorated, and he was returned to the hospital.  He was returned to the nursing home
     on January 3, 2006 and died there four days later.

15

16           The medical examiner testified that Parks died as a result of the injuries inflicted
     on him on December 10, 2005, together with his pre-existing condition.  The examiner
17       concluded that the injuries inflicted on Parks were significant and life threatening to him
     given his pre-existing condition.  The examiner denied that any injuries that may have
18       been caused by a fall from his wheelchair at the nursing home acted as an intervening
     cause of death.

19   (Lodgment No. 9 at 3-4.)

20   **III.    PROCEDURAL BACKGROUND**

21           On February 29, 2007, the San Diego County District Attorney's Office filed a Second Amended

22   Information charging Julie Spencer with murder, a violation of California Penal Code (Penal Code)

23   § 187(d) (count one), first degree robbery, a violation of Penal Code §§ 211 and 212.5(a) (count two),

24   attempted arson causing great bodily injury, a violation of Penal Code §§ 451(a) and 664 (count three),

25   willful cruelty to an elder causing death, a violation of Penal Code § 368(b)(1) (count four), caretaker

26   theft from an elder, a violation of Penal Code § 368(e) (count five), false imprisonment of an elder, a

27   violation of Penal Code § 368(f) (count six), and two counts of forgery, violations of Penal Code

28   § 470(d) (counts seven and eight).  (Lodgment No. 1 at 11-14.)  As to count one, the Information also

1  alleged that Spencer personally used a knife, within the meaning of California Penal Code § 12-22(b)(1),

2  and as to count four, the Information alleged Spencer personally inflicted great bodily injury, within the

3  meaning of Penal Code § 12022.7(c). (*Id.* at 12-13.)

4       Following a jury trial, Spencer was convicted of all counts and the jury found all the weapons

5  enhancements to be true. (*Id.* at 0173-80.) The jury fixed the degree of murder at second degree. (*Id.*

6  at 0173.) Spencer was sentenced to a total prison term of two years plus fifteen years-to-life for the

7  murder count.[2] (Lodgment No. 1, vol. 1 at 0106-10.)

8       While her trial was still going on, Spencer filed two habeas corpus petitions in the San Diego

9  Superior Court, one on March 27, 2007, and one on April 18, 2007. (Lodgment Nos. 2, 4.) Both were

10  denied in written, unpublished decisions. (Lodgment Nos. 3, 5.)

11       Spencer appealed her conviction to the California Court of Appeal, Fourth Appellate District,

12  Division One. (Lodgment Nos. 6-8.) The appellate court affirmed her convictions and sentence in a

13  written, unpublished opinion. (Lodgment No. 9.) Spencer then filed a Petition for Review in the

14  California Supreme Court.[3] (Lodgment No. 10.) The California Supreme Court denied the petition

15  without citation of authority. (Lodgment Nos. 11-12.)

16       Spencer filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 in this Court on November

17  9, 2009. (ECF No. 1.) The petition was dismissed without prejudice and with leave to amend on

18  November 19, 2009, because Spencer had failed to satisfy the filing fee requirement and had failed to

19  name a proper Respondent. (ECF No. 3.) Petitioner was given until January 19, 2010, to file a First

20  Amended Petition and satisfy the filing fee requirement. (*Id.*)

21  ///

22

23       [2] Spencer was sentenced to the mid term of two years in prison for each of the two forgery counts, four years in prison for the robbery count, and two years in prison for the attempted arson count. The sentences for

24  the robbery, attempted arson and one of the forgery convictions were to be served concurrently to one of the forgery counts. Spencer received a sentence of fifteen years-to-life for the second degree murder conviction.

25  (Lodgment No. 1, vol. 1 at 0106-110.) The sentences for the elder abuse, caretaker theft and false imprisonment convictions were stayed pursuant to Penal Code § 654, which bars separate sentencing for acts that were

26  committed during one continuous course of conduct. The sentences for the weapons enhancements were also stayed. (*Id.* at 0108.)

27

28       [3] The California Supreme Court docket indicates two petitions for review were filed, one on August 19, 2008, which was deemed premature, and one on September 3, 2008, which was deemed to be the operative petition. (Lodgment No. 12.)

1   On January 15, 2010, Petitioner filed a First Amended Petition. (ECF No. 4.) Due to a clerical

2   error, the First Amended Petition was not dismissed until January 3, 2011. (ECF No. 6.) Petitioner was

3   given until March 8, 2011, to file a Second Amended Petition and satisfy the filing fee requirement. (*Id.*)

4   On February 16, 2011, Petitioner filed a Second Amended Petition together with a motion to

5   proceed in forma pauperis. (ECF Nos. 7-8.) On February 28, 2011, the motion to proceed in forma

6   pauperis was granted, and a briefing schedule was set. (ECF Nos. 9-10.)

7   Respondent filed a motion to dismiss the petition on April 8, 2011, which the Court denied on

8   September 20, 2011. (*See* ECF Nos. 14-15.) Respondent then filed an Answer and Memorandum of

9   Points and Authorities in Support of the Answer on October 6, 2011. (ECF Nos. 17-18.) Spencer filed

10   a Traverse on January 12, 2012. (ECF No. 26.) On February 23, 2012, the matter was transferred from

11   the docket of then Magistrate Judge Cathy Ann Bencivengo to the docket of Magistrate Judge Bernard

12   G. Skomal. (ECF No. 27.) On March 19, 2012, the matter was transferred a second time, from the

13   docket of Magistrate Judge Skomal to the docket of Magistrate Judge Karen S. Crawford. (ECF No. 30.)

14   **IV.   DISCUSSION**

15       A.   *Standard of Review*

16   This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act

17   of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will

18   not be granted with respect to any claim adjudicated on the merits by the state court unless that

19   adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of

20   clearly established federal law; or (2) resulted in a decision that was based on an unreasonable

21   determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C.

22   § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal

23   court is not called upon to decide whether it agrees with the state court's determination; rather, the court

24   applies an extraordinarily deferential review, inquiring only whether the state court's decision was

25   objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386

26   F.3d 872, 877 (9th Cir. 2004).

27   A federal habeas court may grant relief under the "contrary to" clause if the state court applied

28   a rule different from the governing law set forth in Supreme Court cases, or if it decided a case

1    differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535

2    U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state

3    court correctly identified the governing legal principle from Supreme Court decisions but unreasonably

4    applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application"

5    clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief,

6    the state court's application of clearly established federal law must be "objectively unreasonable." *See*

7    *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

8           Where there is no reasoned decision from the state's highest court, the Court "looks through" to

9    the underlying appellate court decision and presumes it provides the basis for the higher court's denial

10   of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court

11   order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent

12   review of the record to determine whether the state court's decision is contrary to, or an unreasonable

13   application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th

14   Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336

15   F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when

16   resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the

17   result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will

18   not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes

19   of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time

20   the state court renders its decision." *Andrade*, 538 U.S. at 72.

21          B. *Analysis*

22          Spencer has filed three petitions in this case. In her first petition, Spencer alleged there was

23   insufficient evidence presented to support her convictions in counts one through five and counts seven

24   and eight, the improper introduction of autopsy photographs prejudiced the jury, and her counsel was

25   ineffective when he failed to meet with her to discuss defense strategy, failed to call witnesses, and failed

26   to present an effective defense. (Pet. at 3-7, ECF No. 1; Pet'rs Ex. at 3-43.) In her first amended

27   petition, Spencer again alleges there was insufficient evidence presented to support her convictions in

28   counts one through five and counts seven and eight, her attorney rendered ineffective assistance when

1  he failed to call witnesses and mount an effective defense, and that the judge, defense counsel and the

2  prosecutor were prejudiced against her. (FAP at 6-9, ECF No. 4.) In her second amended petition,

3  Spencer alleges counsel rendered ineffective assistance when he failed to call witnesses and mount an

4  effective defense. (SAP at 6, ECF No. 7.)

5  Respondent addresses all claims raised in all three petitions and makes no argument about

6  whether the second amended petition, containing only the ineffective assistance of counsel claim, is the

7  operative pleading or whether any claims have been forfeited by virtue of Spencer's failure to raise them

8  in subsequent petitions. Accordingly, the Court will construe Spencer's second amended petition as a

9  motion to consolidate her three petitions, and **RECOMMEND** the motion be **GRANTED**. The Court

10  will therefore address the claims raised in the three petitions.

11  1. *Exhaustion and Procedural Default*

12  Respondent contends the only claim Spencer has exhausted is the one which attacks the

13  sufficiency of the evidence presented to support her conviction for second degree murder. (Mem. of P.

14  & A. Supp. Answer at 21-26, ECF No 18.) According to Respondent, Spencer has also procedurally

15  defaulted the unexhausted claims because if she attempted to raise them in the California Supreme Court

16  now, she would be met with a state procedural bar. (*Id.*)

17  It appears from the documents submitted by Respondent that this is correct. Spencer never

18  challenged the sufficiency of the evidence supporting her convictions for robbery, attempted arson, elder

19  abuse, caretaker theft from an elder and forgery, nor her claims regarding the admission of the autopsy

20  photographs, ineffective assistance of counsel and prejudice by the trial judge, prosecutor and defense

21  counsel in the California Supreme Court, only in the San Diego Superior Court. (*See* Lodgment Nos.

22  2-5.) Respondent further argues that because Spencer has no available remedy in state court now,

23  however, those claims are procedurally defaulted. In cases like Spencer's, the Ninth Circuit has held

24  such claims are "technically exhausted," but deemed procedurally defaulted if the procedural rule that

25  would be imposed is independent and adequate. *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).

26  The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent

27  must first "adequately [plead] the existence of an independent and adequate state procedural

28  ground . . . ." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). In order to place the defense at

1   issue, Spencer must then "assert[] specific factual allegations that demonstrate the inadequacy of the

2   state procedure . . . ." *Id.* If the Ninth Circuit has previously found a procedural rule to be inadequate,

3   however, a petitioner may meet her burden under *Bennett* by "simply contesting the adequacy of a state

4   rule." *King v. LaMarque*, 464 F.3d 963, 967 (9th Cir. 2006). The "ultimate burden" of proving

5   procedural default, however, belongs to the state. *Id.* If the state meets its burden under *Bennett*, federal

6   review of the claim is foreclosed unless Spencer can "demonstrate cause for the default and actual

7   prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the

8   claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750

9   (1991).

10          A state procedural rule is "independent" if the state law basis for the decision is not interwoven

11   with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *Harris v. Reed*, 489 U.S. 255, 265

12   (1989). A ground is "interwoven" with federal law if the state has made application of the procedural

13   bar dependent on an antecedent ruling on federal law such as the determination of whether federal

14   constitutional error has been committed. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). "To qualify as

15   an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed'."

16   *Walker v. Martin*, 562 U.S. __, 131 S. Ct. 1120, 1127-28 (2011) (quoting *Beard v. Kindler*, 558 U.S. __,

17   130 S. Ct. 612, 618 (2009).)

18          Respondent has met his initial burden under *Bennett* by contending Spencer is barred from

19   raising her unexhausted claims in state court by the independent and adequate state procedural bar of *In*

20   *re Harris*, 5 Cal. 4th 813, 825-27 (1993), which states a petitioner may not raise a claim in a habeas

21   corpus petition which could have been raised on direct appeal. (Mem. of P. & A. Supp. Answer at 25,

22   ECF No. 18.) The burden therefore shifts to Spencer to establish *Harris* is not independent or adequate.

23   *Bennett*, 322 F.3d at 586. She has not presented any evidence or argument demonstrating that *Harris*

24   is not independent or adequate. Accordingly, she has failed to meet her burden under *Bennett*. *Id.*

25          Nor has she established either cause or prejudice sufficient to excuse the default. Cause is

26   satisfied if Spencer can demonstrate some "objective factor" that precluded her from raising her claims

27   in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky*

28   *v. Zant*, 499 U.S. 467, 493-94 (1991). While Spencer does allege trial counsel was ineffective, she does

1   not contend that ineffectiveness was the reason she did not raise the procedurally defaulted claims on

2   appeal.

3       "Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the

4   alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).  Spencer has failed to establish

5   any prejudice would result from the state court's refusal to address the merits of her unexhausted claims

6   because, as discussed below in sections IV(B)(2)(ii)-(vi) and IV(B)(3)-(5) of this Report and

7   Recommendation, the claims are meritless.

8       Finally, Spencer has also not demonstrated that failure to consider the claims will result in a

9   fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. The Supreme Court has limited the

10  "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has

11  probably resulted in one who is *actually* innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (emphasis

12  added).  "Actual innocence" means factual innocence, not simply legal insufficiency; a mere showing

13  of reasonable doubt is not enough. *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997).  Although, as

14  discussed below, Spencer argues there was insufficient evidence to convict her of seven of the eight

15  charges she faced, has not presented evidence sufficient to establish she is actually and factually innocent

16  of the charges of which she was convicted.  Thus, the unexhausted claims are procedurally defaulted.

17  *Schlup*, 513 U.S. at 327; *Cooper*, 641 F.3d at 327.

18      For the foregoing reasons, the Court concludes Spencer's insufficiency of evidence claims

19  regarding her convictions for robbery, attempted arson, elder abuse with great bodily injury, caretaker

20  theft from an elder, and forgery, her claim regarding prejudicial admission of the autopsy photographs,

21  her ineffective assistance of counsel claims and her claim of prejudice on the part of the trial judge,

22  prosecutor and defense counsel, are procedurally defaulted.  In the alternative, they are without merit,

23  as discussed below. *See Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002) (stating that when a state court

24  could not reach the merits of a claim because a procedural bar prevented it, "AEDPA's standard of

25  review does not apply"); *see also Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003) (applying a *de

26  novo* standard of review to such cases).

27  / / /

28  / / /

I:\Everyone\_EFILE-PRO\SPK3\SpencerR&R.wpd

09cv2541

2. *Insufficiency of Evidence*

Spencer contends there was insufficient evidence presented to support her convictions in counts one through five (murder, robbery, attempted arson causing great bodily injury, willful cruelty to an elder causing great bodily injury or death, caretaker theft from an elder) and counts seven and eight (forgery). Pet. at 3, ECF No. 1.) She does not challenge the sufficiency of the evidence with respect to her conviction for false imprisonment of an elder. (*Id.*) With regard to the second degree murder conviction, she argues a fall Parks suffered at Fredericka Manor when he was recovering from his injuries was a sufficient intervening cause which absolved her of responsibility for his death. (Pet, Ex. at 1-4, 12-16, ECF No. 1.) She also argues the evidence showed Parks likely set the fires at his home accidentally when he burned his food, that she was not present at Parks' residence when the crimes occurred, that Parks was not as independent as prosecution witnesses claimed but rather had fallen many times while she worked for him, that he was mentally unstable and drinking heavily, and that other caregivers were employed by Parks and could have inflicted the injuries. (*Id.*) She contends there was insufficient evidence to support her forgery convictions because no evidence was presented that established the signature on the checks was fraudulent. (*Id.* at 5-6.) Spencer also claims she did not steal any money from Parks, but rather that Parks had loaned her the money and she was paying him back. (*Id.*) As to the charge of elder abuse with great bodily injury, Spencer claims the evidence established Parks' injuries were minor and that no knife or DNA connected her to the injuries Parks sustained. (*Id.* at 7-8, 12-16.) Finally, she challenges her convictions for caretaker theft from an elder by arguing that no evidence was presented establishing the value of the phones she allegedly took met the necessary statutory definition ($400). (*Id.* at 9.)

i. *Murder Conviction*

Spencer's essential argument with regard to her murder conviction is that Parks was recovering from the injuries he sustained during the assault and was not in danger of dying until he fell while at Fredericka Manor. This fall, and the subsequent failure of medical staff at Fredericka Manor to treat Parks in a timely manner, rendered him bed bound, which led to him developing pneumonia and dying. Spencer claims Parks suffered the broken rib which led to his pneumonia not as a result of the assault but during his fall at Fredericka Manor. (Pet., Ex. at 12-19, ECF No. 1; FAP at 6, 13-17, ECF No. 4;

1  Traverse at 1-12, ECF No. 26.)  She also claims Parks suffered from other pre-existing conditions,

2  including emphysema, which caused his death. (*Id.*)

3       Spencer raised this claim in the petition for review she filed in the California Supreme Court.

4  (Lodgment No 10.)  The California Supreme Court denied the petition without citation of authority.

5  (Lodgment No. 11.)  Accordingly, this Court must "look through" to the state appellate court's opinion

6  denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.   That court wrote:

7       When we review a claim of insufficient evidence to support a conviction we
   apply the familiar substantial evidence standard of review.  Under that standard, we

8  review the entire record and draw all reasonable inferences in favor of the trial court
   decision.  We do not weigh the evidence or make credibility determinations.  We simply

9  inquire whether there was sufficient substantial evidence from which the jury could have
   found the necessary elements of the offense to be proved beyond a reasonable doubt.

10 (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

11      In this case, the question is whether Spencer's acts are the proximate or legal
   cause of the victim's death.  The legal principles controlling this area of law have been

12 well settled.  In order to be criminally liable for the death of another, the defendant must
   have done an act, which was the actual and proximate cause of the death.  An act is the

13 actual cause if the death would not have occurred but for the defendant's act.  (*People
   v. Cervantes* (2001) 26 Cal.4th 860, 866; *People v. Brady* (2005) 129 Cal.App.4th 1314,

14 1324.)

15      "To be considered the proximate cause of the victim's death, the defendant's act
   must have been a substantial factor contributing to the result, rather than insignificant or

16 merely theoretical." (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583-84.)

17      Case law recognizes that there may be more than one "proximate cause" of the
   death of a person.  However, where the defendant's act is a substantial factor contributing

18 to the death, the existence of another contributing, or concurrent cause of death will not
   relieve a defendant of responsibility.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 847.)

19

20      A defendant may be relieved of liability for an act that is a concurrent cause of
   death where there is a superceding cause that breaks the chain of causation.  In order to

21 absolve the defendant of liability the superceding cause must be independent of the
   defendant's actions and must not have been reasonably foreseeable at the time of the

22 defendant's conduct.  (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953; *People v.
   Schmies* (1996) 44 Cal.App.4th 38, 49; *People v. Roberts* (1992) 2 Cal.4th 271, 319.)

23      Here the question is first whether Spencer's acts were a substantial factor in
   bringing about the death of Parks.  The medical testimony clearly establishes that they

24 were very significant given the victim's pre-existing condition and age.  The broken rib
   would have made breathing very difficult and increased the chances of pneumonia in a

25 person with the lung condition from which Parks suffered.  The pathologist testified the
   injuries were significant and they were in fact a contributing cause of death.

26

27      Spencer is thus left with the argument that the fall at the nursing home may have
   been followed by inadequate medical care, thus it should have been in independent,

28 intervening cause of death.  There are several problems with Spencer's argument.  First,
   there is no obvious evidence to support it.  While there is slight conflict in the record, the

1   nurse who responded to the alarm set off by Parks's fall denied any delay. There was no
    medical evidence that any act or failure to act by the nursing home was a contributing
2   factor in the cause of death. Second, the pathologist specifically denied that any action
    of the nursing home was an independent cause of death. Finally, the possibility of
3   inadequate medical care is reasonably foreseeable to a person who viciously assaults and
    abandons a seriously injured elderly person such as Parks. A foreseeable consequence
4   of injuries inflicted by a defendant on a victim is not an independent, intervening cause
    that will terminate the defendant's responsibility for his or her actions. (*People v.*
5   *Dilworth* 274 Cal.App.2d 27, 33; *People v. Roberts, supra,* 2 Cal.4th at p. 312.)

6          Spencer does not challenge the instructions given to the jury in this case, as
    indeed she cannot. The jury, fully informed of the law, could easily conclude there was
7   no independent, intervening cause of the death of Jack Parks. The death came as a clear
    consequence of injuries inflicted on a person, already in a weakened condition. They
8   could reasonably find that nothing happened after Spencer's attack that should relieve her
    of responsibility for the harm she caused.
9

10  (Lodgment No. 9 at 4-6.)

11         California law, which the state court used to review Spencer's sufficiency of the evidence claim,

12  is consistent with the standard the Supreme Court enunciated in *Jackson v. Virginia,* 443 U.S. 307

13  (1979), "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

14  trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Juan H.*

15  *v. Allen,* 408 F.3d 1262, 1274 (9th Cir. 2005) (quoting *Jackson,* 443 U.S. at 319 (1979)). In making this

16  determination, the Court must accept the elements of the crime as defined by state law. *See Jackson,*

17  443 U.S. at 324, n.16; *Aponte v. Gomez,* 993 F.2d 705, 707 (9th Cir. 1993) (stating that federal courts

18  are "bound by a state court's construction of its own penal statutes"). The same rule applies to

19  convictions based on circumstantial evidence. *People v. Avila,* 46 Cal. 4th 680, 724-25 (2009).

20         In California, a defendant may be found guilty of second degree murder if he or she commits

21  an act with implied malice which proximately causes death. Implied malice can be found where "the

22  [death] proximately resulted from an act, the natural consequences of which are dangerous to life, which

23  act was deliberately performed by a person who knows that his conduct endangers the life of another and

24  who acts with conscious disregard for life." *People v. Canizalez,* 197 Cal. App. 4th 832, 842 (2011)

25  (quoting *People v. Dellinger,* 49 Cal.3d 1212, 1217 (1989) (internal quotation marks omitted).)

26  California courts have described proximate causation liability as follows:

27         It is proximate causation, not direct or actual causation, which together with the requisite
           mental state determines the defendant's liability for murder. (*People v. Sanchez* (2001)
28         26 Cal.4th 834, 845.) Just because the actual cause of death cannot be determined does

1   not undermine a . . . murder conviction. (*Ibid.*) There may be multiple proximate causes
    even where there is but one actual cause. (*Id.* at p. 846, 111 Cal.Rptr.2d 129, 29 P.3d
2   209.) The People's burden of proving causation is met if evidence is produced from
    which it may be reasonably inferred that the defendant's act was a substantial factor in
3   producing the result of the crime. (*People v. Scola* (1976) 56 Cal.App.3d 723, 726, 128
    Cal.Rptr. 477 (*Scola*), cited with approval in *People v. Caldwell* (1984) 36 Cal.3d 210,
4   220, 203 Cal.Rptr. 433, 681 P.2d 274.)

5   *Id.*

6           Viewing the evidence in a light most favorable to the prosecution, as required by *Juan H.*, the

7   Court concludes the state court correctly found there was sufficient evidence to support Spencer's

8   conviction for second degree murder. People who knew Parks before the assault uniformly described

9   him as being in good health and full of energy. (Lodgment No. 14, vol. 2 at 115-16, vol.3 at 396-98,

10  411-13, 417-18, 430-31, 450-51, vol. 4 at 601-02.) As a result of the assault, Parks suffered fractured

11  facial bones, a subarachnoid hematoma (brain bruising), a deep cut to his ear, a broken rib and bruising

12  all over his body. (Lodgment No. 14, vol. 3 at 267, 269, 285-94.) Dr. Joseph Kazanchi, who attended

13  to Parks in the hospital, testified Parks also had chronic obstructive pulmonary disease, more commonly

14  known as emphysema. The combination of the rib fracture, the emphysema, and the fact that Parks was

15  bed ridden concerned Dr. Kazanchi because it significantly increased the possibility that Parks would

16  develop a lung collapse and/or pneumonia. (*Id.* at 308-09, 313-14.) Specifically, Dr. Kazanchi testified

17  that patients with a fractured rib often are afraid to take deep breaths because of the pain associated with

18  the fracture, and this, in conjunction with having emphysema and being bedridden, significantly

19  increases the likelihood that a patient with develop pneumonia. (*Id.* at 308-09, 313-14.) As a result,

20  Parks was put on pain medication and was directed to use a device that would help him to take deeper

21  breaths. (*Id.* at 308-09.) Physical therapy was recommended for Parks to assist in his recovery, in part

22  because of an unsteady gait he had developed, possibly from the head injuries Parks received during the

23  assault. (*Id.* at 310-11.) Because Parks was out of immediate distress and would require a period of

24  rehabilitation and physical therapy longer than four or five days, the physical therapist assigned to Parks

25  recommended he be transferred to a skilled nursing facility where his needs could be better addressed.

26  (*Id.*)

27          Parks was admitted to Fredericka Manor, a skilled nursing facility, on December 13, 2005.

28  (Lodgment No. 14, vol. 4 at 478.) Dr. Efrain Valladolid examined him the next day. (*Id.*) Dr.

1    Valladolid described Parks as alert, with some short and long term memory loss, but who remembered

2    the details of the assault. (*Id.* at 479.) Dr. Valladolid documented Parks' injuries upon admission as

3    multiple facial fractures, a rib fracture, a subarachnoid hemorrhage, a cut on his ear and multiple bruises.

4    (*Id.* at 477, 479.) Parks also had a history of reflux, hypertension, high cholesterol and gout. (*Id.* at

5    481.) Dr. Valladolid's treatment plan was to continue pain medication for the fractures and to continue

6    treating his other conditions with medications he was already taking. (*Id.* at 482.) He also ordered a

7    nasal canula to deliver oxygen. (*Id.* at 489.) One of Dr. Valladolid's main goals was to get Parks mobile

8    in order to assist in his recovery; he considered Parks to be debilitated and unable to care for himself

9    when he was admitted to Fredericka Manor. (*Id.* at 483-84.) According to Margo Miller, nursing

10   director at Fredericka Manor, when Parks arrived at the facility he was "non-ambulatory." Over time

11   he could walk with assistance, but at no time was Parks able to walk on his own while at the facility.

12   (*Id.* at 518.)

13           On December 19, 2005, Dr. Valladolid was told Parks had fallen out of his wheelchair while in

14   his room at Fredericka Manor. (*Id.* at 485.) Parks suffered a bump on the head and scrapes on his arm.

15   (*Id.* at 544-45, 557.) Dr. Valladolid ordered x-rays of Parks' lower back and hips. (*Id.* at 486.) The x-

16   rays did not show any new fractures, but did show Parks had suffered compression fractures in his spine

17   a significant amount of time before he was admitted to the hospital as a result of the assault in this case.

18   (*Id.* at 487.) Dr. Valladolid opined these fractures were causing Parks' chronic back pain. (*Id.*)

19           On December 28 or 29, 2005, Dr. Valladolid received a call telling him Parks' respiratory

20   function had worsened. (*Id.* at 489.) Dr. Valladolid attributed this to Parks' emphysema and the

21   exacerbating influence of the rib fracture. (*Id.* at 490.) Parks was readmitted to the hospital on Dr.

22   Valladolid's orders. (*Id.* at 490-91.)

23           On January 3, 2006, Parks was sufficiently stable to return to Fredericka Manor. (*Id.* at 491-92.)

24   Dr. Valladolid examined him on January 4, 2006, and noted that Parks' respiratory condition had

25   worsened. (*Id.* at 492.) At that point, Parks was confined to bed and unable to participate in any

26   physical therapy. (*Id.* at 494.) Parks died on January 7, 2006. (*Id.* at 495.)

27           The coroner who performed the autopsy on Parks, Dr. Jonathan Lucas, documented the same

28   injuries and chronic conditions Dr. Kazanchi and Dr. Valladolid had — rib fracture, subarachnoid

1   hematoma, facial fractures, bruising, a cut to his ear, hypertension and emphysema. (Lodgment No. 14,

2   vol. 5 at 683-93.) Based on the autopsy he performed, he opined the cause of death was a combination

3   of injury and natural disease, with the primary cause being the injuries he sustained during the assault

4   and the contributing factors being his emphysema and hypertension, although he conceded that an

5   argument could be made "to flip those two around." (*Id.* at 709-10.) He described his findings this way:

6   > [THE PROSECUTOR]: And what led you to sway in favor of the injuries, rather
>    than the natural disease?

7

8   > [DR. LUCAS]: Well, two things. One, by virtue — by calling it a homicide, I'm
>    taking it out of the natural death, and I just want to highlight the fact that there were
>    injuries. So I gave the respect due to the injuries by making them the primary cause.

9

10  > The other, and probably more important reason is that as we touched on it a little
>    bit, the definition of the cause of death is the thing, the injury or disease which initiates
>    a lethal sequence of events in a natural and continuous sequence without an intervening

11  > cause.

12  > So in looking at the forest in this case, it all started with the injuries, and
>    everything went downhill from there. So that was why I put it at the top.

13

14  > Q: And the phrase when you say, "It all started with the injuries," if you were
>    given information that prior to December 10, 2005, people would visit Mr. Parks, would
>    comment upon him even though he was 98, were describing him as the energizer bunny,

15  > would talk about him being mobile enough to go walk up and down stairs, to operate the
>    computer and to do stocks, go out for dinner. Would that present to you evidence that,

16  > indeed, the inception of the chain of events were those injuries on December 10th?

17  > A: Absolutely. And I had that information before I certified the death, and that
>    played a big role. If I — if hypothetically he had been bed bound, oxygen dependent, you

18  > know, and then had lived another month, this would be a little bit murkier for me. But
>    the fact that he was active, as you said, the energizer bunny, whatever, you know, that

19  > makes this issue of cause much more clear for me.

20  (*Id.* at 712.)

21  Although Dr. Lucas was not aware of Parks' fall at Fredericka Manor at the time of the autopsy,

22  he testified the information would not have changed his conclusions in any way. (*Id.* at 715.) He

23  unequivocally stated that the fall was not "an efficient intervening cause" that was responsible for Parks'

24  death. (*Id.*)

25  Spencer essentially argues that the jury should have interpreted the evidence presented

26  differently, and should have concluded the fall at Fredericka Manor and Parks' other health conditions

27  were intervening events that caused Parks' death. The evidence presented at trial, however, very clearly

28  showed that it was Spencer's assault on Parks which set in motion the series of events which led to his

1  death. Although Parks suffered from emphysema, there was no evidence presented that he was

2  significantly debilitated by it prior to the assault. For example, he did not use an oxygen tank to help

3  him breathe before the assault. He was mobile and able to care for himself in most aspects of his life,

4  except for those that required two hands, such as changing a lightbulb or fixing a faucet. (Lodgment No.

5  14, vol. 2 at 68-69.) Testimony by the medical professionals who treated Parks convincingly established

6  that, but for the rib fracture and other injuries inflicted by Spencer, Parks would not have been bed bound

7  and unable to breathe deeply enough to fend off the pneumonia that ultimately killed him. The jury thus

8  rationally concluded that Spencer acted with implied malice by beating, cutting and tying up Parks and

9  attempting to prevent him from obtaining medical attention by taking the phones from his residence and

10  his hearing aids. They jury also rationally concluded that the injuries Spencer inflicted, most importantly

11  the broken rib, proximately caused Parks' death by exacerbating his respiratory impairment, leading to

12  the pneumonia that ultimately claimed his life.

13       ii. *Robbery*

14       Spencer argues there was insufficient evidence presented to support her robbery conviction

15  because there was no evidence presented she was in possession of the stolen items, namely Parks'

16  hearing aids and his phones, or that she was armed with a knife during the robbery. (Pet. at 3, ECF No.

17  1.) In California, "[r]obbery is the taking of 'personal property in the possession of another against the

18  will and from the person or immediate presence of that person accomplished by means of force or fear

19  and with the specific intent permanently to deprive such person of such property.'" *People v. Lewis*, 43

20  Cal.4th 415, 464 (2008). As noted above, the same standard of review, namely "whether, after viewing

21  the evidence in the light most favorable to the prosecution, any rational trier of fact could have found

22  the essential elements of the crime beyond a reasonable doubt," applies to convictions based on

23  circumstantial evidence. *Avila*, 46 Cal. 4th at 724-25; *Juan H.*, 408 F.3d at 1275 (internal quotations

24  omitted).

25       There was evidence that Parks employed other caregivers before September 2005.

26  (*See* Lodgment No. 14, vol. 4 at 601.) Parks' neighbor, Conrad Giersch, and Parks' niece, Connie Leigh,

27  however, testified that about two months before the crimes, Parks hired Spencer as his caregiver.

28  (Lodgment No. 14, vol. 2 at 69-70, vol. 3 at 441, 446-47.) Parks told paramedics who were attending

1   to him that his caregiver had beat him, cut his ear with a knife and stole his hearing aids. (Lodgment No.

2   14, vol. 2 at 128-29.)  Parks' finger and ear were cut, he had a black eye and was complaining of pain

3   in his rib area. (*Id.* at 125, 131.)  Police and a neighbors who were helping Parks after the assault noted

4   the phones in Parks' home had been removed and Parks' hearing aids were not there. (Lodgment No.

5   14, vol. 2 at 84-85, 203, 232-34.)  A phone which appeared to belong to Parks was found in Spencer's

6   house. (Lodgment No. 14, vol. 5 at 779.)  From this evidence, a reasonable jury could have concluded

7   that Spencer assaulted Parks with the knife, then took his hearing aids and phones. *Juan H.*, 408 F.3d

8   at 1275.

9        iii.  *Attempted Arson Causing Great Bodily Injury*

10       Spencer contends there was insufficient evidence to support her conviction for attempted arson

11   causing great bodily injury. (Pet. at 3; Ex. at 3–4, ECF No. 1.)  She argues the fire captain testified the

12   fire started on the kitchen counter, which is the same height as the burn marks found on Parks' shirt.

13   Parks' blood was also found in the vicinity of the area where the fire started and severely burned food

14   was found inside the oven.  She contends this evidence indicates Parks himself started the fire with the

15   burned food. (*Id.*)  In addition, she argues there was no evidence presented to show Parks was injured

16   by the fire. (*Id.*)

17       "Arson is committed when a person 'willfully and maliciously sets fire to or burns or causes to

18   be burned ... any structure, forest land, or property.' (§ 451.)  As the term is used in section 451,

19   'maliciously' involves acting with 'a wish to vex, defraud, annoy, or injure another person, or an intent

20   to do a wrongful act....' (§ 450, subd. (e.).)" *People v. Booker*, 51 Cal. 4th 141, 177 (2011). "[G]reat

21   bodily injury means a significant or substantial physical injury. *People v. Wade*, 204 Cal. App. 1142,

22   1150 (2012) (quoting Penal Code § 12022.7(f) (West 2012) internal quotation marks omitted).  There

23   is no requirement that a victim seek or need medical treatment.  *Id.*  An attempt simply requires a

24   defendant to intend to commit a crime and take a direct but ineffective step toward its commission.

25   *People v. Herman*, 97 Cal. App. 4th 1369, 1385 (2002); *see also* Judicial Council of California Criminal

26   Jury Instructions, No. 460; Lodgment No. 1 at 0065.  Thus, to prove Spencer committed attempted arson

27   causing great bodily injury, the prosecution had to prove she intended to willfully and maliciously burn

28   / / /

1  Parks' home with the intent to inflict great bodily injury on him and took a direct but ineffective step

2  toward accomplishing that objective.

3  　　　　Jeffrey Hood, a paramedic who attended to Parks, testified Parks told him he had confronted his

4  caregiver about checks she had forged and the caregiver had beat him, cut his ear, tied him up with the

5  vacuum cleaner cord and then "tried to set his house on fire." (Lodgment No. 14, vol. 2 at 129.) Hood

6  testified there were "a couple of burned areas in the carpet and it smelled like something had been

7  burning too." (*Id.* at 136.) Fire captain Donald Anderson testified he saw several piles of burned debris

8  inside the residence. (*Id.* at 152-53.) The burned areas did not appear to be accidental because of the

9  numerous areas of burned debris. (*Id.* at 153.) During the investigation, Detective Robert Luke of the

10  San Diego County Sheriff's bomb and arson unit examined a blue shirt and a white undershirt found at

11  the foot of the bed in Parks' home. (Lodgment No. 14, vol. 3 at 370.) On the right side above the belt

12  line, the blue shirt was burned completely through and the white undershirt had scorch marks on it. (*Id.*

13  at 371.) The shirt also had what appeared to be blood on the back, chest and neck area. (*Id.*) Detective

14  Luke testified it appeared that the person was wearing the shirt when the blood was transferred on to it.

15  (*Id.* at 378.) From this evidence, a reasonable jury could have concluded that after beating, cutting and

16  incapacitating Parks with the vacuum cleaner cord, Spencer attempted to set his home on fire. *Juan H.*,

17  408 F.3d at 1275. The jury could have also reasonably concluded that Spencer either attempted to set

18  Parks on fire as well, or that Parks, in an attempt to put out the fires Spencer started, inadvertently set

19  his shirt on fire. Either way, the evidence presented is sufficient to support the jury's conclusion that

20  Spencer intended to willfully and maliciously, and with the intent to significantly or substantially injure

21  Parks, set fire to Parks' home, and that she took a direct but ultimately ineffective step toward the

22  commission of those offenses. *See Juan H.*, 408 F.3d at 1275; *Booker*, 51 Cal. 4th at 177; *Wade*, 204

23  Cal. App. at 1150; *Herman*, 97 Cal. App. 4th at 1385.

24  　　　　iv.  *Willful Cruelty to an Elder Causing Great Bodily Injury or Death*

25  　　　　Spencer contends there was insufficient evidence to support her conviction for willful cruelty to

26  an elder causing great bodily injury or death because no knife or other weapon used to injure Parks was

27  ever found, her fingerprints were not found in Parks' home or on any weapon, and her DNA was not

28  found in the home. Spencer also contends the evidence established Parks' injuries were not sufficiently

1   severe so as to constitute great bodily injury and that Parks never identified her by name as his assailant,

2   only that his caregiver had assaulted him.  Spencer claims Parks had other caregivers working for him

3   at the time of the crimes and Parks could have been referring to one of his other caregivers. (Pet., Ex.

4   at 7-8, ECF No. 1-1; FAP at 6, 13-21, ECF No. 4.)

5          In order to be convicted of willful cruelty to an elder causing great bodily injury or death, a

6   person must "know or reasonably should know that a person is an elder . . . and who, under

7   circumstances or conditions likely to produce great bodily harm or death, wilfully causes or permits any

8   elder . . . to suffer, or inflicts thereon unjustifiable physical pain or mental suffering." *People v. Racy*,

9   148 Cal. App. 4th 1327, 1332-33 (2007) citing Penal Code § 368.  "Elder" is defined as any person 65

10  years or older. Penal Code § 368(g).  As previously stated, "[g]reat bodily injury means a significant or

11  substantial physical injury." *Wade*, 204 Cal. App. 4th at 1150; *see also* CALCRIM 3162.

12         There is no dispute that Spencer knew Parks was an elder within the meaning of the statute.

13  Further, as discussed above, the paramedic who treated Parks testified Parks told him he had confronted

14  his caregiver about checks she had forged and the caregiver had beat him, cut his ear, tied him up with

15  the vacuum cleaner cord and then "tried to set his house on fire." (Lodgment No. 14, vol. 2 at 129.)

16  When Parks was taken to the emergency room, he was found to have fractured facial bones, a

17  subarachnoid hemorrhage, a broken rib, bruises in many areas of his body, a cut ear and possible internal

18  bleeding. (Lodgment No. 14, vol. 3 at 267, 269, 285-94.)  The emergency room doctor further testified

19  that Parks was a "major multiple trauma patient." (*Id.* at 295.)  Even if no knife was ever found, this

20  evidence is sufficient to lead a reasonable jury to conclude that Spencer committed the crime of willful

21  cruelty to an elder causing great bodily injury. *Juan H.*, 408 F.3d at 1275.

22         v.  *Caretaker Theft from an Elder and Forgery*

23         Spencer argues there was insufficient evidence to support her conviction for caretaker theft from

24  an elder because there was no evidence presented that established the value of the phones and hearing

25  aids she took was over $400. (Pet., Ex. at 9-11, ECF No. 1-1; FAP at 24–25, ECF No. 4.)  A conviction

26  for theft from an elder requires the prosecution to prove that a caretaker committed a theft, forgery,

27  embezzlement or fraud, and took "moneys, labor, goods, services, or real or personal property"

28  belonging to an elder that was worth more than $400. Penal Code § 368(d).  Forgery requires the

1  prosecution to prove that a person passed or used a forged check knowing the check was forged and with

2  the intent to present the check as genuine.  Penal Code § 470(d).

3       Paramedic Jeffrey Hood testified Parks told him his caregiver had stolen $10,000 worth of checks

4  from him.  (Lodgment No. 14, vol. 2 at 139.)  San Diego Sheriff Sergeant Mark Varnau testified he

5  found a check register in Parks' computer desk.  (*Id.* at 235.)  The register contained "a list of checks,

6  and to whom he had paid and the amounts and a running total."  (*Id.* at 237.)  The dates of the checks

7  were from October 1, 2005, through December 9, 2005.  (*Id.* at 238.)  Next to check numbers 1266 and

8  1276 was the handwritten word, "forged."  (*Id.* at 254.)  Copies of those checks from Parks' banks were

9  introduced at trial.  Check number 1266 was in the amount of $4,718 and was written to Julie Spencer.

10  (*Id.* at 256.)  Check number 1276 was in the amount of $6,451.46 and was written to Fireside, a finance

11  company for automobiles.  (*Id.* at 256-57, 258-60.)  According to the check register, Parks was deducting

12  $1200 a month from Spencer's pay as repayment for the forged checks.  (*Id.* at 261.)

13       Parks' bookkeeper and friend, Gary Weathers also testified.  He kept Parks' books from about

14  1992 until 2005 and became very familiar with Parks' handwriting.  (Lodgment No. 14, vol. 4 at 602-03,

15  609-11.)  Weathers testified he recognized the "forged" notation as Parks' handwriting and that the

16  signatures on checks 1266 and 1276 did not belong to Parks.  (*Id.* at 610-11.)

17       The fraud investigator at Parks' bank, Terry Johnson, testified the checks in question were

18  negotiated by Spencer's bank, North Island Federal Credit Union.  (*Id.* at 624-25.)  Photos were

19  introduced establishing Spencer was the individual who cashed the $4,718 check.  (*Id.* at 657.)  A

20  stipulation was entered into the record which stated that Linton Mohammad, a senior forensic document

21  examiner for the San Diego County Sheriff, would testify that check numbers 1266 and 1276 probably

22  were not signed by Parks.  (Lodgment No. 14, vol. 5 at 796.)

23       While the evidence presented was circumstantial, a rational jury could have concluded there was

24  sufficient evidence presented to establish that Spencer forged Parks' signature on the two checks, then

25  passed those checks with the intent to present them as genuine.  *Juan H.*, 408 F.3d at 1275.  The statute

26  proscribing caretaker theft from an elder specifically states that the prosecution must show that "*moneys,*

27  *labor, goods, services, or real or personal property*" belonging to the elder that was worth more than

28  / / /

1    $400. Penal Code § 368. Since the value of the checks exceeded $10,000, there was sufficient evidence

2    to satisfy that portion of the statute. *Id.*

3         3. *Introduction of Prejudicial Autopsy Photographs*

4         Next, Spencer contends the trial court improperly admitted autopsy photographs of the victim,

5    Jack Parks. (Pet. at 4, ECF No. 1.) She argues the photos prejudiced the jury against her and that the

6    prosecutor suggested to the jury the photographs represented injuries suffered by Parks.   (*Id.*)

7    Respondent contends the claim does not state a federal constitutional question because it concerns only

8    the operation of state evidentiary law. (Mem. of P. & A. Supp. Answer at 34, ECF No. 18.)   In the

9    alternative, Respondent notes that the admission of evidence only violates federal due process rights if

10   the jury can draw no permissible inference from it. (*Id.* at 35, citing *Boyde v. Brown*, 404 F.3d 1159,

11   1172 (9th Cir. 2005), *Houston v. Roe*, 177 F.3d 901, 910, n. 6, and *Jammal v. Van de Kamp*, 926 F.2d

12   918, 920 (9th Cir. 1991).)

13        A state court's erroneous evidentiary ruling cannot form the basis for federal habeas relief unless

14   federal constitutional rights are affected. *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000)

15   citing *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir.1987). "While a petitioner for federal habeas relief

16   may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary

17   decision created an absence of fundamental fairness that 'fatally infected the trial.'" *Ortiz-Sandoval v.*

18   *Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th

19   Cir.1986).) "[A] trial court's ruling does not violate due process unless the evidence is 'of such quality

20   as necessarily prevents a fair trial.'" *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (internal

21   quotation marks omitted).  If a due process error is found, the Court must then determine if it had a

22   "substantial and injurious effect in determining the jury's verdict." *Brecht*, 507 U.S. at 622.

23        Spencer cites to two California cases, *People v. Wattier*, 51 Cal. App. 4th 948 (1996) and *People*

24   *v. Cervantes*, 26 Cal.4th 860 (2001) in support of her argument.  *Wattier* concerned the question of

25   causation in a vehicular manslaughter case and the trial court's exclusion of evidence that the victim was

26   not wearing a seat belt.  *Cervantes* concerned the causation element in a prosecution for provocative act

27   murder.  Thus, neither is applicable to the admission of the autopsy photographs.  Spencer specifically

28   complains the prosecutor misled the jury by representing that the autopsy photographs, which contained

1  depictions of "liver mortis," a condition whereby blood pools beneath the skin after death, showed the

2  injuries she inflicted on Parks. (Pet. at 4, ECF No. 1.) During questioning of the coroner, the prosecutor

3  did use autopsy photographs to explain to the jury what injuries Parks had suffered before he died, but

4  the testimony given by the coroner very clearly distinguished between bruises which were the result of

5  injuries inflicted before death and liver mortis:

6      [THE PROSECUTOR]: Showing you now what has been marked as People's
       exhibit 51. Can you point out to the jurors again, what bruising you saw on his lower
7      extremities?

8      [DR. JONATHAN LUCAS]: There is some bruising on the inside of the right
       thigh. I don't know if that's visible. And there is certainly — I think you can see the
9      larger blue bruise on the inner aspect of the right knee. You can also see that there is
       bruising on the right — the left shin region. There is also bruises on the top of the left
10     foot. And that pretty much is what you can see in the photos.

11     Q: Going back to what I previously marked people's exhibit 48, were there any
       indications of any bruising on Mr. Parks's back?

12

13     A: Yes.

14     Q: And can you point to that?

15     A: This is on the right — well, just above the right shoulder blade. If I may —
       I don't want this to be misinterpreted, his back is red. And there is this area of white.
16     And that's simply blood settling with gravity after death. It's called liver mortis.

17     THE COURT: Could you spell that please?

18     THE WITNESS: L-I-V-O-R M-O-R-T-I-S. Two words.

19     So the pale area is from him — the pressure from him being on his back, so the
       blood can't actually get in there, but within this area of livor mortis, there is a bruise.

20     BY MR. GREENWOOD:

21     Q: Can you pinpoint where that bruise is?

22     A: Right here just above the right shoulder blade.

23  (Lodgment No. 14, vol. 5 at 698-99.)

24      The photographs were properly admitted as evidence of Parks' injuries. Contrary to Spencer's

25  claim, the prosecutor did not mislead the jury regarding what the photographs contained. Thus, their

26  admission did not amount to a federal due process or "create[ ] an absence of fundamental fairness that

27  'fatally infected the trial.'" *Ortiz-Sandoval*, 81 F.3d at 897.

28  / / /

4. *Ineffective Assistance of Trial Counsel*

Spencer claims her attorney rendered ineffective assistance in several ways.   Specifically, Spencer alleges her attorney:

— was prejudiced against her and intimidated by the district attorney;

— told her her case was hopeless and it was pointless to bring in any witnesses or evidence;

— was vomiting blood during the trial and unable to focus on her case;

— did not consult with her sufficiently about the case, visiting her only four times in sixteen months;

— presented no evidence or witnesses in her defense;

— failed to call witnesses who could have testified Spencer was ill on December 7, 2005, went to the doctor, and moved out of Parks' home on December 9, 2005, because she was extremely ill with bronchitis and pneumonia;

— discouraged her from testifying by intimidating her;

— failed to introduce evidence that Parks sent her a Christmas card with a $500 check in it;

— failed to introduce evidence that Parks fell on November 12, 2005, was injured, and was also showing signs of suffering from the flu; and

— failed to introduce evidence that Parks told her he had other care givers.

(Pet. at 7, ECF No. 1; Ex. at 24-32; FAP at 7, 26-32, ECF No. 4; SAP at 6,  ECF No. 7; Traverse at 16-27, ECF No. 26.)

To prevail on a claim of ineffective assistance of trial counsel in federal court, Spencer must establish the state court's application of *Strickland v. Washington*, 466 U.S. 668, 687 (1984) was unreasonable.  To satisfy *Strickland*'s standard, Spencer must have shown in state court that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689.  Second, she must have shown in state court that counsel's deficient performance prejudiced the defense, such that the result of the proceeding would have been different absent counsel's errors. *Id.* at 687.   On federal habeas review, "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 788 (2011).  The Court need not address the

1  performance prong if the claim can be resolved on the ground of lack of sufficient prejudice. *Strickland*,
2  466 U.S. at 697.

3      Spencer's claims that her attorney was prejudiced against her, was intimidated by the district
4  attorney, told her her case was hopeless and was vomiting blood are conclusory and without sufficient
5  specific factual support to warrant a finding by this Court that counsel's performance was unreasonable
6  or that she was prejudiced by counsel's alleged errors. *Strickland*, 466 U.S. at 687, 689. She provides
7  no evidence, such as affidavits by her attorney or other persons, establishing her counsel was prejudiced
8  against her, was so intimidated by the district attorney that he was not functioning as counsel or that he
9  was vomiting blood during the course of her trial. Nor does she provide any evidence or argument
10  regarding how this alleged prejudice, intimidation or illness on the part of her attorney resulted in
11  prejudice against her such that the outcome of the case would have been different absent counsel's
12  errors. *Strickland*, 466 U.S. at 686-89. Conclusory allegations cannot form the basis for federal habeas
13  relief. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

14      Spencer has also failed to establish either that counsel acted unreasonably or that she was
15  prejudiced by counsel's errors with regard to her claim that counsel visited her only four times before
16  her trial. She claims she and her attorney "discussed things" and that she suggested ways in which to
17  defend her but that counsel did not pursue any of them and did not discuss a defense strategy with her.
18  (FAP at 28, ECF No. 4; SAP at 6, ECF No. 7.) Spencer does not, however, explain specifically what
19  would have been accomplished or what specific defenses would have been developed had counsel visited
20  her more often, or why visiting her only four times was an error by counsel "so serious that counsel was
21  not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466
22  at 687. She simply alleges that counsel should have visited more. In addition, does not cite any specific
23  prejudice she suffered as a result of counsel not visiting more than four times, other than a general
24  complaint that he did not present a sufficient defense to the charges. This conclusory allegation is
25  insufficient to establish the result of the proceeding would have been different had counsel visited her
26  more than four times. *Id.* at 687; *Juan H.*, 408 F.3d at 1275.

27      Spencer claims counsel was ineffective because he failed to present any evidence or witnesses
28  in her defense. Specifically, she contends counsel should have presented evidence and witnesses who

could have testified she was extremely ill on December 7, 2005, she visited her doctor who diagnosed her with bronchitis and pneumonia, and, as a result of her illness and Parks' threats to her, she moved out of Parks' home on December 9, 2005, a day before the assault. (Pet. at 7, ECF No. 1; Pet'rs Ex. at 24-26, ECF No. 1; FAP at 7, 28-29, ECF No. 4.) The only witness she identifies in this context is Donna Reeder, a friend from church, who submitted a letter to the trial court asking for leniency for Spencer after she was convicted. (Pet. at 7, ECF No. 1.) Reeder, however, does not state anything in the letter that demonstrates Spencer was ill or that Spencer moved out of Parks' home on December 9. Reeder does say that she did not attend the trial, did not hear any of the evidence presented, the behavior attributed to Spencer was out of character with the Spencer she knew, and expressing concern about the quality of Spencer's attorney's performance. (Lodgment No. 1 at 0115-16.)

Reeder also spoke at Spencer's sentencing hearing, along with the pastor of Spencer's church, Janine Metcalf. (Lodgment No. 14, vol. 9 at 988-89.) At the hearing, Reeder again expressed her shock at Spencer's conviction and her concern about the quality of Spencer's defense, noting that no one from Spencer's church had been contacted by Spencer's attorney. (*Id.* at 989-90.) She also stated that Spencer was "very sick the last few weeks of her employment," that Spencer had "told us situations that were very difficult for her," and that she and others had "recommended that [Spencer] quit her job when she said some of these things that she shared with us." (*Id.* at 990.) Metcalf expressed similar sentiments of shock and disbelief at the allegations against Spencer, her conviction and concern about the quality of Spencer's representation. (*Id.* at 991-92.)

Spencer has not established her attorney's failure to present Reeder or Metcalf as witnesses was unreasonable under *Strickland*, or that she suffered the requisite prejudice. *Strickland*, 466 U.S. at 687, 689. Based on the evidence before the Court, it appears Reeder and Metcalf could have testified that the allegations were out of character for Spencer, and Reeder could have further testified Spencer was sick the week of the attack and that she was experiencing some "difficulties" at work. Even if Spencer was sick and experiencing difficulties as work, however, this evidence would not have negated any of the elements of the crimes of which Spencer was accused. Accordingly, Spencer's attorney could have made a reasonable, tactical decision that accusing Parks of wrongdoing or attempting to gain sympathy for Spencer's sickness would have alienated the jury from Spencer rather than help her defense.

1    *Harrington*, 131 S. Ct. at 788. Further, Spencer has not established the outcome of her trial would have

2    been different had Reeder and Metcalf testified. *Strickland*, 466 U.S. at 689. The jury could have

3    believed Spencer was sick, the actions were out of character and she was experiencing "difficulties" in

4    her employment with Parks and still convicted Spencer of the offenses based on the evidence before

5    them. *Id.*

6        Next, Spencer alleges her counsel rendered ineffective assistance by discouraging her from and

7    intimidating her into not testifying in her own defense. A criminal defendant has a fundamental

8    constitutional right to testify on his or her own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49, 51 (1987).

9    "The right is personal, and 'may only be relinquished by the defendant and the defendant's

10    relinquishment of the right must be knowing and intentional.'" *United States v. Pino-Noriega*, 189 F.3d

11    1089, 1094 (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)); *see also Duhaime v.*

12    *Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000) (finding that Ninth Circuit "cases may be persuasive

13    authority for purposes of determining whether a particular state court decision is an 'unreasonable

14    application' of Supreme Court law, and also may help us determine what law is 'clearly established.'").

15    "The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying

16    him his constitutional right to testify." *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009) (citing

17    *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007)).

18        Counsel has no obligation to ask a defendant to testify if, in his judgment, it would not assist in

19    the defense. The decision whether to have a defendant testify is a tactical one which is afforded great

20    deference under *Strickland*. *Matylinsky*, 577 F.3d at 1097. Indeed, waiver of the right may be inferred:

21       "[W]hile waiver of the right to testify must be knowing and voluntary, it need not be
        explicit." *See id.* A defendant is "presumed to assent to his attorney's tactical decision
22       not to have him testify." *Id.* The . . . court has no duty to affirmatively inform
        defendants of their right to testify, or to inquire whether they wish to exercise that right.
23       *United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990); *United States v. Martinez*, 883
        F.2d 750, 760 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991).
24       "[W]aiver of the right to testify may be inferred from the defendant's conduct and is
        presumed from the defendant's failure to testify or notify the court of his desire to do so."
25       *Joelson*, 7 F.3d at 177. A defendant who wants to reject his attorney's advice and take
        the stand may do so "by insisting on testifying, speaking to the court, or discharging his
26       lawyer." *Id.* When a defendant remains "silent in the face of his attorney's decision not
        to call him as a witness," he waives the right to testify. *United States v. Nohara*, 3 F.3d
27       1239, 1244 (9th Cir. 1993).

28    *Pino-Noriega*, 189 F.3d at 1094-95.

1    There is no evidence in the record showing Spencer told the trial court she wanted to testify in

2    her own defense or that her attorney was preventing her from doing so. Thus, she is presumed to have

3    assented to her attorney's strategic decision that she not testify. *Id.*

4    Further, as previously noted, "the question [on federal habeas review] is not whether counsel's

5    actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied

6    *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788. Here, counsel could have reasonably

7    decided that Spencer would not have been a good witness in her own defense and would not have fared

8    well under cross examination. Spencer's statement at her sentencing hearing gives the best indication

9    of how Spencer would have testified at trial. During that hearing, Spencer told the judge that Parks had

10   been "going down hill" since he fell in November of 2005. (Lodgment No. 14, vol. 9 at 993.) She said

11   she was "very sick" on her last day of work, which she claims was December 9, 2005, and was not

12   thinking well. (*Id.* at 994.) Spencer denied stabbing, kicking or punching Parks, but admitted she tied

13   his ankles up with the vacuum cord. She claimed Parks was drunk and she was trying to protect herself

14   from him. (*Id.* at 995-96.) She speculated that after she left on December 9, Parks called another

15   caregiver to work and that the caregiver must be the one responsible for his death. (*Id.* at 997.) She said

16   that although she may have thought about stabbing someone and may have wanted to because she was

17   so angry, she would never actually do such a thing, and that she had learned from her anger management

18   classes that if she were every to feel that way, she should simply walk away from the situation. (*Id.* at

19   997.) After Spencer finished, the trial judge noted that Spencer had sent a letter to him in which she

20   stated she was mentally ill. (*Id.* at 998.) The trial judge also had this to say about her attorney's decision

21   not to put Spencer on the stand:

22       [THE COURT]: The other comment I wish to make is that there was some talk
         about Mr. Herrera's decision, joined presumably by Ms. Spencer, that she not testify
23       during this case. And, really, from what I know about the case, it's really the only
         decision I think a competent defense attorney could have made.

24
         The problem with a person as prolific as Ms. Spencer, who, for months upon
25       months, has imposed tens of thousands of words in letters — I thought they were all sent
         to the court, and I now find they have been sent to the [prosecutor]. The problem is with
26       that kind of prolific writing is that when you write that much, and you write so many
         different versions and so many different days about the same general subject matter, there
27       are going to be — it provides unlimited fertile ground for the opposite side of the case
         to impeach anything this person says on the stand, because somewhere, in one of those

28

1    writings, there is going to be something that is at odds with anything she says after she
2    spells her name.

3            And to try to put a person on the stand for whom there are tens of thousands of
     words out there about the subject matter that she is going to talk about, that she wrote,
     would be suicide. Had he done it, had Julie Spencer testified in this case, and had the
4    jury reached the same result, he would, no doubt, have five people in the second row,
     who are here now, saying how could this defense attorney possibly have put her on the
5    stand, under those circumstances, and I want you to look into it, Judge.

6            So, really, I mean, no matter what the result, this is going to be the criticism. And
     those of us in the system, understand it. The prosecutors, defense attorneys, and judges
7    understand it. I am sure probation officers do. No matter what we do, no matter what
     decisions we make, there's going to [be] people out there who are going to criticize
8    witnesses. It just comes with the territory.

9    (*Id.* at 999-1001.)

10           Given Spencer's erratic nature, her changing version of events, and her prolific writings, it was

11   a reasonable, tactical decision not to put Spencer on the stand in her own defense. *Strickland*, 466 U.S.

12   at 687. Moreover, Spencer has not established the outcome of her trial would have been different had

13   she testified. *Id.* at 689. The evidence supporting Spencer's convictions, while circumstantial, was quite

14   strong, as discussed above. There was no independent evidence supporting Spencer's speculation that

15   another caregiver assaulted Parks, nor her claim that Parks was "going downhill" before the assault, and

16   the jury would have likely dismissed her testimony.

17           Next, Spencer faults her attorney for failing to introduce evidence that Parks sent her a Christmas

18   card with a $500 check in it. (Pet, Ex. at 26, ECF No. 1-1.) She contends Parks would not have done

19   so had she stolen money from him and assaulted him. (*Id.*) Spencer provides no proof that Parks sent

20   her a Christmas card with a $500 check enclosed. Moreover, Spencer has not established the card was

21   mailed after, not before, the attack. If the card was mailed before the attack, it was eminently reasonable

22   for her attorney to conclude the card and check had no value to the defense. *Strickland*, 466 U.S. at 687.

23   In any event, this piece of information alone would not have defeated the circumstantial evidence that

24   supported her conviction, and thus Spencer has not established the requisite prejudice required under

25   *Strickland. Id.* at 689.

26           Spencer complains counsel failed to introduce evidence that Parks fell on November 12, 2005,

27   was injured, and was also showing signs of suffering from the flu. (Pet., Ex. at 28-30, 32.) She claims

28   witness Diana Thompson testified she saw Parks on November 12, 2005, with injuries from a fall, but

1  told Spencer not to take him to the emergency room. (*Id.* at 28.) The Court has reviewed Thompson's

2  testimony. According to the transcript, Thompson visited Parks at his home sometime during the first

3  two weeks of November, 2005. (Lodgment No. 14, vol. 3 at 393.) He was in good health and did not

4  have any difficulty walking or conversing. (*Id.* at 398.) She did not have any concerns about his health

5  when she left. (*Id.* at 401.) Contrary to Spencer's claim, Thompson did not testify she saw Parks with

6  injuries from a fall or suffering from the early signs of the flu. Moreover, Betty Koeppen, a volunteer

7  with the Santee Sheriff's Department who visited Parks on December 9, 2005, testified he was in good

8  health and spirits, walking without difficulty and without assistance. (*Id.* at 413, 417.) Thus, there is

9  simply no evidence to support Spencer's claim that Parks fell and was injured on November 12, 2005,

10  or that he was suffering from early signs of the flu, and thus counsel cannot be faulted for failing to ask

11  Thompson about the injuries Spencer alleges Parks suffered. *Strickland*, 466 U.S. at 687-89.

12       Finally, Spencer alleges counsel was ineffective when he failed to introduce evidence that Parks

13  had other caregivers. Spencer claims she left Parks' employ on December 9, 2005, then speculates Parks

14  called another caregiver to work for him who ultimately committed the crimes of which she was

15  convicted. (Pet, Ex. at 31-32, ECF No. 1-1; FAP at 26, 31.) Spencer provides no evidence, such as an

16  affidavit, to support her claim that Parks was employing anyone other than Spencer in December of

17  2005. Testimony at the trial established that Parks had caregivers other than Spencer prior to September

18  of 2005. (Lodgment No. 14, vol. 4 at 601.) According to Parks' neighbor, Conrad Giersch and Parks'

19  niece, Connie Leigh, about two months before the crimes, sometime in October, Parks hired Spencer.

20  (Lodgment No. 14, vol. 2 at 69-70; vol. 3 at 441, 446-47.) Given this evidence, counsel could have

21  reasonably concluded that investigating the presence and possible culpability of other caregivers would

22  be fruitless.

23       5. *Prejudice by Judge, Prosecutor and Defense Counsel*

24       In Spencer's final claim, she argues that her attorney, the prosecutor, the coroner, and the trial

25  judge were prejudiced against her. (Pet., Ex. 1 at 22-32.) She claims her attorney frightened her into

26  not testifying, failed to put on any evidence or witnesses in her defense, and told her her case was

27  hopeless. She contends the prosecutor intimidated her attorney into not presenting a defense by arguing

28  that any witnesses or evidence would be construed as further evidence of Spencer's guilt. She claims

1  the coroner was prejudiced against her because he concluded Parks' death was caused by Spencer's

2  assault and not Parks' overall poor health and the fall he suffered at Fredericka Manor. Finally, she

3  contends the trial judge was prejudiced against her because he told her that she would have received a

4  sentence of twenty-five years to life had she testified. (*Id.*) Respondent argues Spencer's prejudice

5  claim is conclusory and her allegations do not establish any of the individuals named were prejudiced

6  against her or that she was denied a fair trial as a result of any actions by those individuals. (Mem. of

7  P. & A. Supp. Answer at 41-43, ECF No. 18.)

8       Spencer's claim that her attorney was prejudiced against her is essentially a re-hash of her

9  ineffective assistance of counsel claim, which this Court has already addressed in section IV(B)(4)

10 above. The court has concluded counsel did not render ineffective assistance, and, likewise here, the

11 allegations Spencer makes against her attorney do not rise to the level of establishing her trial was unfair.

12

13      The claims of bias or prejudice on the part of the prosecutor also do not establish she did not

14 receive a fair trial. "'To establish a prima facie case of prosecutorial vindictiveness, a defendant must

15 show either direct evidence of actual vindictiveness or facts that warrant an appearance of such.'" *Nunes*

16 *v. Ramierz-Palmer*, 485 F.3d 432, 441 (9th Cir. 2007) (quoting *United States v. Montoya*, 45 F.3d 1286,

17 1299 (9th Cir.1995).) Spencer's claims that the prosecutor and coroner were prejudiced against her are

18 without any support whatsoever and are conclusory. Spencer simply disagrees with the prosecutor's

19 decision to prosecute her for Parks' death and the coroner's conclusion that her assault was the cause

20 of Parks' death.

21      Finally, the trial judge's observation is also not evidence of prejudice such that her trial was

22 fundamentally unfair. "The Due Process clause 'requires a fair trial in a fair tribunal before a judge with

23 no actual bias against the defendant or interest in the outcome of his particular case.'" *Sivak v.*

24 *Hardison*, 658 F.3d 898, 924 (9th Cir. 2011) (citing *Smith v. Mahoney*, 611 F.3d 978, 997 (9th Cir.

25 2010) (internal quotes and citations omitted).) The Supreme Court has noted that judicial bias is shown

26 in only the most egregious situations:

27           [O]pinions formed by the judge on the basis of facts introduced or events occurring in
             the course of the current proceedings, or of prior proceedings, do not constitute a basis
28           for a bias or partiality motion unless they display a deep-seated favoritism or antagonism

1  that would make fair judgment impossible. Thus, judicial remarks during the course of
   a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their
2  cases, ordinarily do not support a bias or partiality challenge. They may do so if they
   reveal an opinion that derives from an extrajudicial source; and they will do so if they
3  reveal such a high degree of favoritism or antagonism as to make fair judgment
   impossible . . .[but] expressions of impatience, dissatisfaction, annoyance, and even
4  anger, . . . are within the bounds of what imperfect men and women, even after having
   been confirmed as federal judges, sometimes display.
5

6  *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

7        The trial judge's acknowledgement that he would not have found Spencer to be a credible

8  witness in light of the evidence presented, and that her denial of responsibility on the witness stand

9  would have given him reason to sentence her more harshly than he did was, quite simply, an "opinion

10  formed by the judge on the basis of facts introduced or events [which occurred] in the course of

11  the . . . proceedings." *Id.* It does not, therefore, rise to the level of judicial bias or prejudice, nor is it

12  evidence that Spencer received a fundamentally unfair trial.

13  **V.**     **CONCLUSION**

14        The Court submits this Report and Recommendation to United States District Judge Roger T.

15  Benitez under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court

16  for the Southern District of California.  For the reasons outlined above, **IT IS HEREBY**

17  **RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and

18  Recommendation, (2) **GRANTING** the motion to consolidate the petitions, and (3) **DENYING** the

19  Petition for Writ of Habeas Corpus.

20        **IT IS ORDERED** that *__no later than November 16, 2012__* any party to this action may file written

21  objections with the Court and serve a copy on all parties. The document should be captioned "Objections

22  to Report and Recommendation."

23        **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

24  served on all parties *__no later than November 30, 2012__*. The parties are advised that failure to file

25  / / /

26  / / /

27  / / /

28  / / /

1  objections within the specified time may waive the right to raise those objections on appeal of the

2  Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d

3  1153, 1156 (9th Cir. 1991).

4        **IT IS SO ORDERED.**

5  DATED: 10/11/12

                                             Karen S. Crawford
                                    United States Magistrate Judge